**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 11-14058-CR-MARTINEZ/LYNCH**

UNITED STATES OF AMERICA,

      **Plaintiff,**

**v.**

**MICHELLE W. ISAAC,**

      **Defendant.**

_____/

FILED by ____ D.C.

**APR 1 0 2012**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. PIERCE

**REPORT AND RECOMMENDATION ON DEFENDANT'S**
**MOTION TO SUPPRESS DEFENDANT'S STATEMENT TO THE FBI**
**ON APRIL 7, 2010 AND APRIL 12, 2010 [D.E. #123]**

**THIS CAUSE** having come on to be heard upon the aforementioned motion and this Court having reviewed the motion as well as the government's response, and this Court having conducted an evidentiary hearing on April 3, 2012, makes the following recommendations to the District Court:

1.      The Defendant's motion seeks to suppress the statements made by the Defendant during two interviews by agents of the Federal Bureau of Investigation (FBI) which were conducted at the Defendant's residence on April 7 and April 12, 2010. This Court points out that the Defendant's motion correctly referred to the second meeting between the FBI agents and the Defendant as having occurred on April 12, 2010. The government's response, however, refers to that meeting as having occurred on April 10, 2010. During the initial testimony of the case agent, David Kadela, the government's questions and Agent Kadela's answers in respect to the second meeting all centered on April 10, 2010. This Court noted on the record that there was a discrepancy once counsel for the Defendant began cross-examination and questioning Agent Kadela as to the "April 12, 2010" meeting with the Defendant.

2.      It was then discussed on the record that the government, in its response and in its direct examination of Agent Kadela, had incorrectly referred to that second meeting

as having occurred on April 10, 2010. It was clarified on the record by Agent Kadela, while on the witness stand, and by counsel for the parties, that the correct date of that second meeting was April 12, 2010.

3.      This Court points this fact out at the outset of this Report and Recommendation so that the record is not confusing to the District Court. In reciting the pertinent parts of Agent Kadela's testimony in this Report and Recommendation, this Court will refer to the correct date of that second meeting as being April 12, 2010, so as to not further confuse the record. Based upon Agent Kadela's testimony and the clarification of that testimony by the attorneys for the parties during this hearing, this Court accepts Agent Kadela's testimony wherein he refers to the second meeting as occurring on April 10, 2010, to actually have taken place on April 12, 2010.

4.      The Defendant's Motion To Suppress seeks to suppress the substance of statements made by the Defendant at these two meetings. The Defendant argues that even though the meetings took place in the Defendant's residence, that they were custodial in nature. Based upon this argument, the Defendant submits that the statements on each occasion were not voluntarily given based upon the totality of the circumstances surrounding the statements. Further, the Defendant argues that since the statements were custodial in nature, the failure of the agents to duly advise the Defendant of her Miranda rights violated her constitutional rights under the Fifth and Fourteenth Amendments. Therefore, the Defendant argues that all such statements made on April 7 and April 12, 2010 should be suppressed. The Court will now review the evidence which was presented at the evidentiary hearing.

_____

5.  David Kadela was the sole witness called by the government at this hearing. He has been an agent with the Federal Bureau of Investigation (FBI) for approximately three and one-half years.  He identified the Defendant in open court as the individual he knows to be Michelle Isaac and with whom he met on April 7 and April 12, 2010.  During each meeting with the Defendant at her home, Agent Kadela was accompanied by Agent Martin of the FBI.

6.  The first meeting took place on April 7, 2010 pursuant to an investigation of mortgage fraud and bank fraud being conducted by Agent Kadela.  He and Agent Martin had reason to believe that the Defendant was involved in criminal conduct with Kerry Sookhoo as set forth in the Indictment.  Pursuant to that investigation, Agent Kadela and Agent Martin went to the Defendant's residence in Miramar, Florida, at approximately 2:00 p.m. to 3:00 p.m. on April 7, 2010.  Both agents were dressed in casual clothing, with open collar shirts and slacks.  Agent Kadela testified that both agents had weapons on them, but those weapons were concealed in their clothing.  He stated that at no time during either this meeting on April 7th or the subsequent meeting with the Defendant on April 12th, were their guns ever drawn or intentionally displayed to the Defendant or any other member of her household.

7.  Upon arriving at the Defendant's residence, Agent Kadela rang the doorbell or knocked.  The Defendant answered the door.  The agents both identified themselves as FBI agents and presented their credentials which confirmed their identity with their picture.  The agents briefly explained that they were there to speak with her concerning a possible bank fraud involving Kerry Sookhoo.  The Defendant said that she was willing to speak with the agents, but wanted her husband there at the time.  The agents asked the Defendant when her husband would be home and the Defendant gave them an approximate time.  The agents then got back in their vehicle and left.

3

8.      Approximately one to two hours later, Agent Kadela and Agent Martin returned to the Defendant's residence and saw a vehicle in the driveway which they believed to be that of the Defendant's husband.  The agents then walked to the front door of the residence again and the Defendant answered.  Agent Kadela testified that he and Agent Martin were then permitted to enter the home. The Defendant agreed to be interviewed.  Agent Kadela testified that he and Agent Martin again identified themselves as FBI agents and said that they wished to interview the Defendant concerning an alleged bank fraud.  Agent Kadela testified that the Defendant invited them into her family room on the first floor of the residence.

9.      Agent Kadela could see that the Defendant was pregnant.  However, she did not appear to be in any physical distress.  The Defendant appeared "calm and collected" according to Agent Kadela as the interview began.

10.     The agents began to interview the Defendant about the Kerry Sookhoo matter.  The Defendant's husband, who was later correctly identified as the Defendant's fiancé, William Hilson, asked if he could sit in on the interview.  Agent Kadela stated that because the Defendant was going to be asked questions that may be private in nature, that it would be better if Mr. Hilson was not present during the interview.  Agent Kadela testified that the "privacy issue" he was referring to was that the agents would be discussing with the Defendant possible criminal violations of federal law by the Defendant.  Neither the Defendant nor Mr. Hilson insisted on his remaining for the interview. Mr. Hilson went upstairs in the residence.  Agent Kadela believed that the Defendant's children were somewhere in the house as well.  Agent Kadela stated that neither Mr. Hilson nor any of the children were ever told that they could not come downstairs to other areas of the residence while the interview of the Defendant was being conducted in the family room.

In fact, Agent Kadela believes that Mr. Hilson came downstairs a couple of times during the interview.

11.     During the first half of the interview, the Defendant appeared calm. Once the agents began showing her documentation which possibly conflicted with statements she was making, the Defendant became visibly upset. Agent Kadela testified that at no time was the Defendant restrained in any fashion nor placed under arrest. The Defendant was able to adjust her seating and did so on a couple of occasions to be more comfortable. The Defendant was never prevented from moving about the residence, if she chose to do so. The Defendant then began crying and "hyperventilating" according to Agent Kadela. He recalls that this was at or about the time that the Defendant admitted her role in the Sookhoo fraud. After observing the Defendant becoming upset, Agent Kadela stopped talking with her and conferred with Agent Martin. The agents decided to terminate the interview at that time. Agent Kadela estimated that the interview lasted approximately one hour in total on April 7, 2010.

12.     Once the agents had decided to terminate the interview, Mr. Hilson came downstairs. Agent Kadela testified that the Defendant said that she wanted to continue the interview. However, it was the agents' decision to stop the interview based upon the Defendant having become upset. Neither the Defendant nor Mr. Hilson directed the agents to stop the interview.

13.     The agents left the residence and Mr. Hilson followed them. Agent Kadela testified that Mr. Hilson and the agents engaged in "small talk" as they exited the house. Once they were outside, Mr. Hilson asked the agents if the Defendant was "being faithful to him." Agent Kadela responded to Mr. Hilson that the Defendant's "faithfulness" was not their concern in this investigation and was not any of the agents' business.

14.     Prior to leaving the residence, Agent Kadela told the Defendant that he would call her to continue the interview at a later time.  He testified that neither he nor Agent Martin ever raised their voices. Neither agent made any threats to coerce or intimidate the Defendant at any time during the interview.  Agent Kadela conducted the majority of the interview and admitted that at some point his tone of voice may have become confrontational when he was showing the Defendant various items of documentary evidence which contradicted her statements.

15.     Government's Exhibit No. 1 was admitted into evidence at this hearing, without objection. It is a compact disk containing a very brief recording of a telephone message left by the Defendant on Agent Kadela's telephone on April 8, 2010, the day following the first interview.   This Court has listened to that very brief recording in chambers at the conclusion of the evidentiary hearing. Agent Kadela testified that the woman's voice in the telephone message is the Defendant's voice. In the telephone message, the Defendant identifies herself as Michelle Isaac who Agent Kadela "had met yesterday evening." She then states that she apologizes again for what happened.  She then asks if they could meet tomorrow at 6:00 p.m.  She is heard to ask Agent Kadela to call her back to confirm that meeting and leaves a telephone number. After receiving this message, Agent Kadela called the Defendant and set a time to continue the interview at her home a couple of days later.  The second interview was continued on April 12, 2010 at the Defendant's home.  Once again, Agent Kadela was accompanied by Agent Martin.

16.     Upon arriving at the residence, the Defendant invited the agents into the family room again. The Defendant's fiancé, Mr. Hilson, was present. The Defendant never said that she was suffering from any infirmity, was under the influence of any medicines or otherwise in any distress.  The Defendant was not in custody. According to Agent Kadela, the agents had no intention of arresting her at that time.  The record in this case

reflects that the Defendant was not arrested until December 14, 2011, a year and a half after the conclusion of this second interview.

17.     Agent Kadela testified that once again the Defendant was calm when they began the interview.  Both agents were dressed similarly as they were during the first interview on April 7th.  While they did have weapons concealed on their person, these weapons were at no time drawn or displayed to either the Defendant or her fiancé, Mr. Hilson.  Agent Kadela stated that neither agent yelled at the Defendant, raised their voice, or did anything else to threaten or coerce the Defendant into making any statements. Agent Kadela testified that during both interviews on April 7th and April 12th, both he and Agent Martin were present together the entire time.  There was never a time when the Defendant was alone with either agent.

18.     At no time did the agents tell Mr. Hilson or the Defendant that Mr. Hilson or any of the children could not be present.  Agent Kadela believed that the children were in the home somewhere.  Agent Kadela testified that it is his recollection that Mr. Hilson decided to go upstairs to another area of the home on his own and was not forced to do so.

19.     The interview then proceeded in what Agent Kadela characterized as a "conversational tone."  The Defendant was never restrained, arrested, or otherwise prevented from moving about her residence.  Neither agent ever advised the Defendant that she was going to be arrested that day.  At no point did the Defendant ever ask the agents to leave nor did she ever state that she wished to stop the interview. Agent Kadela does not recall Mr. Hilson ever requesting that the interview be stopped either. The Defendant did not become emotional as she had during the first interview. Agent Kadela estimated that the interview lasted approximately one hour. The interview began in mid-afternoon around 2:00 or 3:00 o'clock. As in the first interview, Agent Kadela, the

Defendant, and Agent Martin were seated on furniture in the family room.  The entire interview took place there.  There was no interaction with the Defendant's fiancé nor any of the Defendant's children.

20.    Agent Kadela stated that neither he nor Agent Martin ever lied to the Defendant.  They were straightforward with the evidence they had. They showed the Defendant various documents which they believed supported their contention that the Defendant had been involved with Kerry Sookhoo in this fraud.  The agents did tell the Defendant that based upon their investigation, they knew she was lying in respect to some of the answers she was giving.  Agent Kadela recalls telling the Defendant during this interview that they were not going to arrest her at that time.  The Defendant was never isolated from her family.  She was never deprived of any food or sleep.  The Defendant was never promised anything. The Defendant was cooperative and admitted her involvement . Further, the Defendant stated that she knew what she had done was wrong. The interview was completed and the agents left the residence. Agent Kadela did not believe the he was required to advise the Defendant of her <u>Miranda</u> rights during either interview since he believed both interviews to be non-custodial in nature.

21.    On cross-examination, Agent Kadela testified that a month or so before the April 7, 2010 interview, the Defendant had been identified as a "person of interest." He and Agent Martin were seeking information from the Defendant and that is why they traveled from their Fort Pierce office to Miramar to interview her.  The agents did not know that the Defendant was on medical leave from her job based upon difficulties she was having with her pregnancy.

22.    When questioned concerning Mr. Hilson not being present during the April 7th interview, Agent Kadela stated that neither agent ordered Mr. Hilson to go upstairs. Agent Kadela said he explained to the Defendant and Mr. Hilson that the matters which

8

they were going to discuss with the Defendant were things that the Defendant may wish to keep private. It was at that point that Mr. Hilson voluntarily left the room and went upstairs according to Agent Kadela.

23. On cross-examination, Agent Kadela stated that he began the interview by telling the Defendant she was a person of interest concerning their investigation of a crime. He cannot recall what specific information he provided to the Defendant. He does recall telling the Defendant that they had documents in their possession which were "problematic" and involved their Sookhoo investigation. He also asked the Defendant to cooperate in the investigation of Sookhoo.

24. Agent Kadela testified on cross-examination that he never told the Defendant she did not have to talk with him. He never told the Defendant that she could have a lawyer present, leave the area, or ask for a lawyer to be present while the interview was being conducted. Further, Agent Kadela never told the Defendant that her willingness to speak with him was entirely voluntary. He testified that he did not believe that he needed to go into these details since these were non-custodial interviews.

25. Agent Kadela did tell the Defendant that lying to a federal agent was a crime in and of itself. He did not do that to pressure the Defendant into making any statements. He simply told her that it because it was a fact.

26. The Defendant's attorney asked Agent Kadela exactly what he told the Defendant concerning "cooperation," Agent Kadela could not recall the specifics of what he said. He did recall telling the Defendant that she could help herself by cooperating. He does not recall if the Defendant made a specific response to that.

27. Agent Kadela stated that no Miranda warnings were given to the Defendant prior to the beginning of either the April 7th or April 12th interviews because he believed them to be non-custodial interviews. He does not recall telling the Defendant during either

interview that they could immediately arrest her for conspiracy. He did bring up the issue of cooperation at some point and that it could be a way for her to "help herself."

28.     On re-direct examination, counsel for the government asked Agent Kadela if there were some private issues and questions which he raised with the Defendant. Agent Kadela testified that he did ask the Defendant if she had been intimate with Kerry Sookhoo and also if she had accepted money from Kerry Sookhoo. Agent Kadela stated that these were some of the reasons why he thought the Defendant's privacy interests may have been best served by her fiancé not being present during the initial interview on April 7th.

29.     When asked by defense counsel as to why those questions concerning any intimate relations with Kerry Sookhoo and money paid by Kerry Sookhoo were not contained within Agent Kadela's report, he responded by saying that he did not believe that those issues were germane to the interview. Agent Kadela testified that the Defendant had advised them at the beginning of the April 7th interview that she was on bed rest due to her pregnancy. However, at no time did the Defendant say that her condition was such that she did not want to speak with the agents.

_____

30.     After the government rested, the Defendant called as her only witness, William Hilson, the Defendant's fiancé. Mr. Hilson is employed by Boeing Corporation as a production supervisor in Fort Lauderdale. He has known the Defendant for eleven years. They have been engaged for the past three years and live together with the Defendant's children in the residence owned by the Defendant. The Defendant's three children are ages 17, 14, and 12. The Defendant and her father are the mortgagors of the property.

31.     On April 7, 2010, Mr. Hilson recalls receiving a telephone call from the Defendant while he was at work.  The Defendant told him that there were two agents of the FBI "from Bank of America" at the residence and could he come home.  He told the Defendant that he would be there shortly.

32.     Mr. Hilson testified that the Defendant was home on medical leave from her job at Bank of America due to having a difficult time with her pregnancy.  She was taking various medications prescribed for her by her doctors, including Tylenol with codeine, cough syrup with codeine, and other medications to address bleeding the Defendant was suffering in relation to the pregnancy.

33.     Mr. Hilson estimated that it took him approximately thirty minutes to get home.  Upon his arrival, he saw "two guys in the driveway" who were later identified as Agents Kadela and Martin.  Mr. Hilson got out of his vehicle and asked the agents who they were.  The agents said they were "FBI from Bank of America."  Mr. Hilson and the two agents then walked to the front door of the residence which Mr. Hilson opened.  Mr. Hilson testified that the Defendant was not present downstairs and that he yelled upstairs three times for the Defendant to come down to the door.  The Defendant did not respond, so Mr. Hilson then went upstairs.  He testified that the FBI agents walked into the house right behind him uninvited.  There was no evidence that Mr. Hilson asked the agents not to come in or to leave the residence.

34.     When the Defendant did not respond to Mr. Hilson's calls, he went upstairs and said he had to wake her up. He and the Defendant then came downstairs.  Agent Kadela then  told Mr. Hilson that he had to go upstairs and could not be present during the interview.  Mr. Hilson testified that he intended on sitting next to the Defendant on the couch in the family room.  However, since these were FBI agents, he did not believe that

he had any choice and had to go upstairs as he says they directed. According to Mr. Hilson, the children were not home at that time.

35.     Mr. Hilson went upstairs and stood in a hallway where he could see and hear what was going on downstairs. Agent Kadela was seated on the couch next to the Defendant within one foot. The other agent was sitting across from the Defendant approximately three feet away with a coffee table in between . Mr. Hilson knew that each agent had firearms on them. However, there was no testimony that either agent ever drew or displayed their firearms to the Defendant or Mr. Hilson. Mr. Hilson's observation of the firearms was when he first saw the agents outside the residence.

36.     Mr. Hilson stated that the April 7th interview began calmly. He said the interview then became "aggressive and confrontational" when the Defendant was unable to answer some of the questions being posed to her by the agents. Mr. Hilson stated that when the Defendant said she could not remember something, the agents told her that she could "go to jail right now for conspiracy." When the Defendant began breathing heavy, Mr. Hilson then went downstairs and asked what was going on. He saw the Defendant in a corner taking deep breaths. It was at this point that Mr. Hilson quotes the agents as saying "We're out of here. We're going." Mr. Hilson then took the Defendant to the hospital where she was admitted overnight for observation. Mr. Hilson did recall that the Defendant's children arrived home at different times during the interview and were also told that they had to go upstairs by Agent Kadela.

37.     On April 12, 2010, the agents came back to the home for the planned continuation of the first interview. While Mr. Hilson was not part of the telephone message left by the Defendant setting up this continuation of the interview, he was well aware that the agents would be coming to continue the interview at a time arranged between Agent Kadela and the Defendant. Mr. Hilson was home when the agents knocked on the door.

The Defendant answered with Mr. Hilson next to her. Mr. Hilson stated that Agent Kadela was present at both the April 7 and April 12 interviews of the Defendant. However, Mr. Hilson recalls the FBI agent who accompanied Agent Kadela at the April 7th interview was not the same agent who accompanied Agent Kadela back to their residence for the April 12th interview. Mr. Hilson described both agents who accompanied Agent Kadela as being Caucasian. He was certain that it was a different agent who accompanied Agent Kadela during the second interview.

38. On April 12th, the Defendant and Mr. Hilson allowed the agents to enter the home since this was a pre-arranged meeting to continue the previous interview. Mr. Hilson testified that he was told again by the agents that he had to go upstairs. He did not question that and once again went to the same hallway upstairs where he could see and hear what was going on. He testified that the interview started calmly and then began getting aggressive again. Mr. Hilson stated that the agents told the Defendant that they could arrest her and take her to jail for conspiracy "right now" because she knew answers to the questions they were asking.

39. Mr. Hilson stated that he came downstairs when he heard the agents ask the Defendant to "wear a wire." Mr. Hilson was concerned and asked why she had to wear a wire. He pointed out that the Defendant was pregnant. It was at this point that Mr. Hilson recalls the agents immediately stopping the interview and leaving the residence without further conversation. This Court notes for the District Court that Mr. Hilson's recollection in this regard changed later on further cross examination as will be pointed out herein.

40. On cross-examination, Mr. Hilson stated that it was only two weeks ago that he had his first conversation with the Defendant's attorney about what he observed during each of these encounters with the FBI agents. Mr. Hilson recalls discussing it with the Defendant every day since the interviews took place, almost two years ago.

41.    Mr. Hilson recalls the FBI introducing themselves as being "FBI from Bank of America." It was pointed out to the agents that the Defendant had been on bed rest as directed by her physician and that she was approximately two months pregnant at the time of the April 7th interview. The Defendant had undergone in vitro fertilization which Mr. Hilson stated was a very sensitive procedure. He was giving her three shots a day as part of that procedure. He testified as to the medications the Defendant was taking at that time. In response to one of the Court's question at the conclusion of his testimony, Mr. Hilson stated that the medications made the Defendant "drowsy." However, he admitted that neither he nor the Defendant told the agents that she was too drowsy to speak with them or answer any of their questions. Mr. Hilson agreed that neither he nor the Defendant advised the agents of her inability to conduct the interviews because of the medications she was taking either on April 7th or on April 12th.

42.    Mr. Hilson restated on cross-examination that when the questioning became confrontational, he immediately came downstairs. He testified that the agents said nothing and immediately left the residence. He stated that there was no conversation between he and the agents. However, after further cross-examination, Mr. Hilson admitted that he now recalls walking outside with the agents and asking them if the Defendant "was cheating on him." Further, Mr. Hilson stated on cross-examination that he was not aware that Kerry Sookhoo was paying the mortgage on the residence in which he was residing with the Defendant and her children.

43.    Mr. Hilson said he knew that the Defendant had called Agent Kadela to set up a continuation of the April 7th interview which took place on April 12th. He estimated that, as with the April 7th interview, the April 12th interview lasted approximately one hour. It took place in mid-afternoon at about 2:00 or 3:00 p.m. as Agent Kadela had testified.

14

44.    On April 12th, Mr. Hilson recalls the doorbell ringing and he and the Defendant answering the door.  The agents simply walked in.  He agreed that neither he nor the Defendant ever told the agents they could not come in.  Neither Mr. Hilson nor the Defendant ever told the agents that the Defendant did not wish to speak with them.  Mr. Hilson stated that he felt that he and the Defendant had no choice in the matter.  He admitted that at no time during either interview did either agent draw their weapons.

45.    Mr. Hilson admitted that while he interpreted the interview as becoming aggressive as it progressed, that neither agent yelled at the Defendant.  The Defendant kept saying that she could not remember certain things.  He never heard the Defendant say that she knew what she did was wrong.

46.    The Defendant's children came home during the interview.  Mr. Hilson admitted that the children did go back and forth into the kitchen without any restriction while the interview was being conducted.

47.    At no time during the April 12th interview did the Defendant become upset as she did on April 7th.  Mr. Hilson stated that the Defendant gave birth to a child as a result of her pregnancy. The child survived for only 28 days. He stated that is not angry at what happened, but feels that the FBI was partially responsible for the loss of the child.  Mr. Hilson feels that the problems with the Defendant's baby were because of the pressure that the FBI placed upon her.  Mr. Hilson testified that the Defendant had told him after the interviews that she felt she was being interrogated and did not have a choice but to answer the questions posed to her by the agents during both interviews.

48.    The Defendant then rested its case in respect to the motion.

_____

49.     The government re-called Agent Kadela in rebuttal.  Agent Kadela testified that the Defendant never appeared to be drowsy or under the influence of any substance on either April 7th or April 12th.  The Defendant seemed lucid on both occasions and reasonably responded to the questions being posed to her.

50.     In respect to the April 7th interview, Agent Kadela does not recall if Mr. Hilson had to call repeatedly upstairs for the Defendant to come down.  Agent Kadela recalls the Defendant meeting Mr. Hilson and the agents at the door.  He recalls both the Defendant and Mr. Hilson indicating to the agents to follow him inside the residence.  At no time did he or Agent Martin ever tell the Defendant that they would take her down and arrest her for conspiracy during either interview.  Further, Agent Kadela reiterated that it was Agent Martin with him on both occasions.  There was not a different agent who accompanied him during the second interview as Mr. Hilson recalls.

51.     The April 12th interview was planned and arranged over the telephone with the Defendant based upon her call to Agent Kadela on April 8, 2010, the day after the initial interview.  Upon arrival on April 12th, the agents were invited into the home.  At no time did either the Defendant or Mr. Hilson ever tell them to leave or stop the interview.  At no time did either agent ever say "We're out of here.  We're going."  At no time did this interview become confrontational.

52.     In respect to the April 7th interview after the Defendant became upset, Agent Kadela recalls the Defendant stating that she wanted to continue the interview.  However, he and Agent Martin conferred and decided to stop the interview based upon the Defendant becoming upset.  It was then that they walked out with Mr. Hilson and talked with him outside of the home.

—————————

16

53.     This concluded all of the evidence and testimony presented by the parties at the evidentiary hearing.

## ANALYSIS

54.     This Court must first make a determination as to whether or not the Defendant was in custody at the time that either of these interviews took place such that she would be entitled to Miranda warnings.  It is a two part inquiry that the Court must make to determine whether the requirements of Miranda were necessary and, if so, were met.  Even if Miranda was not required, the second part of the inquiry addresses whether any statements made by the Defendant were voluntary such that they should be admitted at trial.  United States v. Bernal, 594 F.3d 1303 (11th Cir. 2010).  Whether a person is in custody and entitled to Miranda warnings is a mixed question of law and fact.  The fact that an investigation is focused on a suspect does not necessarily trigger the need for Miranda warnings.  United States v. Muegge, 225 F.3d 1267 (11th Cir. 2000).

55.     A defendant is considered to be "in custody" when under the totality of the circumstances, a reasonable person would feel a restraint on their freedom of movement to such an extent that they would not feel free to leave.  United States v. Moya, 74 F.3d 1117 (11th Cir. 1996).  This test is an objective one.  The actual, subjective beliefs of the Defendant and the interviewing agents on whether the Defendant was free to leave are irrelevant.  United States v. Jackson, 367 Fed. Appx. 55 (11th Cir. 2010). There is a two part inquiry to determine whether the Defendant was "in custody" at the time of the making of the statements in this case. First, this Court must look to the circumstances surrounding the interrogation/interview. Secondly, given the circumstances surrounding the interviews, would a reasonable person have felt that they was not at liberty to terminate the interrogation and leave.  Thompson v. Keohane, 516 U.S. 99 (1995).

56.     Absent an arrest, an interrogation or interview in familiar surroundings such as one's own home is generally not deemed to be custodial in nature.  United States v. Newton, 369 F.3d 659 (2nd Cir. 2004).  Even if the investigating agents advised the Defendant that she was a prime suspect, this is not, in and of itself, dispositive of the custody issue. Some suspects are free to come and go until the police decide to make an arrest, as was done in this case when the Defendant was arrested over one year after the interviews.  See Stansbury v. California, 511 U.S. 318 (1994).

57.     Other relevant factors courts look to in determining whether or not a defendant was in custody are whether a defendant was physically restrained or was told they were under arrest.  In this case, there is no evidence that the Defendant was ever told that she was under arrest.  There is no evidence that the Defendant was in any way restrained.  She was not handcuffed.  Both interviews took place in her family room on her couch.  There is no evidence to suggest that the agents in any way restrained her movement about her own residence.  There is no evidence that the Defendant at any time requested to stop the interviews and have the agents leave her home.  See United States v. Gomes, 279 Fed. Appx. 861 (11th Cir. 2008).

58.     It is not the subjective belief of the Defendant or the investigating officers in this case as to whether or not the Defendant was free to leave or not.  The test is an objective one, as previously set forth herein.  This Court looks at the totality of the circumstances, including the details of the interrogation and the Defendant's characteristics. There is no evidence that the Defendant was lacking in intelligence.  The Indictment in this case sets forth the Defendant's alleged involvement in this mortgage fraud and bank fraud.  The Defendant worked at Bank of America where she allegedly assisted other co-conspirators in committing certain acts which the government contends

were fraudulent in nature.  The Defendant appears to be an intelligent individual who works in the banking industry.

59.     Next, the Court must determine whether or not the agents in this case "overreached" and took advantage of the Defendant in any fashion.  This Court finds no evidence of such "overreaching."  The testimony of Agent Kadela and Mr. Hilson confirms that each interview lasted approximately one hour and took place in the mid-to-late afternoon of each day in question.  This is not a situation where there was a late-night, prolonged interrogation where the Defendant was deprived of food and/or sleep.  The interviews in this case took place at her home while she was sitting in her family room in mid-to-late afternoon.  This Court finds that the time and duration of the interviews were reasonable.

60.     There is no evidence of any physical punishment, threats or coercion by either of the agents during either interview.  There was no display of any weapons.  There was conflicting testimony concerning "threats of immediate arrest" which this Court will address that later herein.  Based upon the totality of the circumstances presented by the evidence, it does not appear as though there was any overreaching or coercive tactics on the part of the agents.  See United States v. Emanuel, 440 Fed. Appx. 881 (11th Cir. 2011).

61.     The evidence establishes that the Defendant freely entered into each of these interviews.  In fact, the second interview was conducted pursuant to an arrangement between Agent Kadela and the Defendant after she contacted Agent Kadela to set up the continuation of the first interview.  The interviews took place at the Defendant's home.  She was not under arrest nor otherwise restrained.  The agents had advised the Defendant of the subject matter of the investigation at their initial contact on April 7, 2010, so the Defendant was not surprised by the matters being addressed during each interview. Further, the evidence establishes that the Defendant was able to communicate with the

agents and make appropriate responses to the questions and answers given. The Defendant was able to converse in detail concerning the issues being addressed during each of the interviews and was not the subject of any prolonged, repeated, or extended interrogation. There is nothing to suggest that the agents took advantage of the Defendant. United States v. Fontecchio, 2007 WL 4199599 (S.D. Fla. 2007).

62.     An issue was raised concerning the mention of "cooperation" by Agent Kadela to the Defendant at some point during these interviews. Agent Kadela recalls mentioning to the Defendant that cooperation could help her. Such a statement is not a sufficient inducement so as to render a subsequent incriminating statement involuntary. United States v. Chealy, 185 Fed. Appx. 928 (11th Cir. 2006). There is no evidence to suggest that any mention of "cooperation" went any further than was related by Agent Kadela during his testimony before this Court. No promises were made in that regard.

63.     This Court will now address some of the conflicts in testimony presented during this hearing. First, this Court finds that there is no conflict concerning the following facts:

a.     That the interviews took place at the Defendant's home where she was not under arrest and was free to move about;

b.     That she was not handcuffed nor restrained in any way;

c.     That there was  no coercion or threats of physical harm;

d.     That the interviews were each relatively short in length and took place during a reasonable time in late afternoon;

e.     That the second interview was set up at the Defendant's request as is corroborated by the telephone message contained within Government's Exhibit No. 1;

f.     That at no time did the Defendant request the agents to leave her home or to cease either interview; and

g.      That no promises were made even though there was a mention of "cooperation", as addressed by this Court above.

64.     The major conflicts between the testimony of Agent Kadela and Mr. Hilson are relatively few in number considering all of the surrounding circumstances of each interview.  The major differences in the testimony as this Court views them are:

a.      That Mr. Hilson was ordered to leave the family room and go upstairs before each interview began;

b.      That the Defendant was under the influence of medications and drowsy;

c.      That both interviews became "confrontational";

d.      That the Defendant was not even downstairs when Mr. Hilson arrived at the home prior to the first interview and he had to wake the Defendant up to come downstairs;

e.      That the agents "threatened" that they could arrest the Defendant at that time for conspiracy;

f.      That a different agent accompanied Agent Kadela during each interview;

g.      That the agents said "We're out of here. We're going."  and no further conversation took place as the agents exited the home; and

h.      That the FBI agents introduced themselves as being "FBI from Bank of America."

65.     The Court must make credibility determinations based upon this Court observing the witnesses testify, their demeanor and their ability to recall specific facts. This Court must also take into consideration any relative interest that the witnesses may have in the case.  This Court does not have to completely discredit one witness or the other nor

21

make a finding that a witness intentionally lied on the witness stand. This Court only need determine that one witness' recollection of specific facts was less credible than another witness' recollection of the same facts. United States v. Emanuel, supra.; United States v. Paige, 241 Fed. Appx. 620 (11th Cir. 2007).

66. The affection for the Defendant and the interest which Mr. Hilson has in this case is obvious. He has been engaged to the Defendant for quite some time. He testified that even though they are not yet married, he considers himself the stepfather of the Defendant's children. Mr. Hilson and the Defendant reside together and have done so for many years even prior to their engagement. This Court does not find any extraordinary interest that Agent Kadela had in this case which affected his recollection of the facts.

67. This Court does not believe that either Agent Kadela or Agent Martin introduced themselves as "FBI agents from Bank of America." The Defendant worked for Bank of America and her work there is alleged to be part of the criminal conspiracy charged in the Indictment. However, this Court finds it very difficult to believe Mr. Hilson's recollection of the facts that any FBI agent would introduce themselves as being "from Bank of America."

68. This Court finds it equally difficult to believe that when Mr. Hilson came downstairs to confront the agents, they immediately said, "We're out of here. We're going.", and left without any further conversation. In fact, when that issue was pressed further on cross-examination, Mr. Hilson changed his testimony and admitted that he walked out with the agents and did have a conversation with them concerning whether or not the agents knew if the Defendant had been unfaithful to him. Mr. Hilson also testified that there was a different agent accompanying Agent Kadela during each interview. Agent Kadela testified that it was Agent Martin who accompanied him on each occasion. Why would Agent Kadela be less than truthful about such a fact which is easily verifiable? This

portion of Mr. Hilson's testimony call into question his candor and ability to recall all of the facts about which he testified.

69.     Mr. Hilson testified that on at least two occasions the agents threatened the Defendant with immediate arrest if she did not cooperate.  This Court discounts that testimony as well.  If the agents were attempting to coerce or put pressure upon the Defendant, they would have asked her to come to one of their field offices as opposed to conducting each interview in the Defendant's own family room. If the Defendant felt coerced or threatened during the first interview on April 7th, then why would she call Agent Kadela, apologize for how that interview ended and set up the second interview to be conducted at her home? This all calls into question Mr. Hilson's recollection of these facts.

70.     Mr. Hilson testified that he was forced to go upstairs by Agent Kadela.  Agent Kadela testified that was not the case.  Agent Kadela explained in his testimony that there were certain privacy concerns which the agents knew would be addressed during their interview with the Defendant.  Agent Kadela testified that these privacy concerns involved the Defendant having committed criminal acts with Kerry Sookhoo, having accepted monies from Kerry Sookhoo and having a relationship with Kerry Sookhoo. Agent Kadela's explanation appears to be reasonable based upon the totality of the evidence.  If the agents wished to isolate the Defendant, they could have requested that she come with them to be interviewed at one of their offices which the Defendant could have refused. This Court chooses to believe the testimony of Agent Kadela that once the explanation of privacy concerns was given, that Mr. Hilson decided on his own to go upstairs while each interview was being conducted.

71.     Mr. Hilson also testified that the medications the Defendant was taking made her drowsy.  However, Agent Kadela testified that the Defendant did not appear to be under the influence of any medications nor did she appear drowsy during either interview.

If the Defendant was unable to converse with the agents, then why was this not raised by either the Defendant or Mr. Hilson at the beginning of each interview?  There is no evidence this medication issue was ever raised until Mr. Hilson's testimony at this hearing. This Court relies upon the testimony of Agent Kadela in this regard.

72.     Mr. Hilson testified that each interview became confrontational.  Agent Kadela admitted that while the agents did not yell at the Defendant, that they did confront her with documentary evidence contradicting some of her statements.  This appears to be the cause for termination of the first interview when the Defendant became upset.  The agents decided to terminate the interview even though the Defendant wished to continue that first interview.  If the agents wished to take advantage of the Defendant's emotional condition, then they would have continued the interview at that time.  What Mr. Hilson deems to be "confrontational" is unclear.  Even if one believed that the interview became "confrontational", there is no evidence either agent raised their voices or yelled at the Defendant to coerce her into answering their questions in either interview.  There is no evidence of threats or coercion.

73.     In summary, this Court finds certain portions of Mr. Hilson's testimony less credible than that of Agent Kadela for the reasons stated above.  Mr. Hilson has an obvious interest in this case based upon his engagement to the Defendant and his relationship with her children.  His subjective view of the facts in this case may, in fact, be tainted by those relationships.  This Court finds the testimony of Agent Kadela more consistent with the totality of the evidence in this case.

74.     Counsel for the Defendant argues there are certain statutory factors which must be considered by this Court in making a determination of voluntariness.  This Court points out that the issue of whether or not the Defendant was entitled to Miranda warnings and whether any subsequent statements were voluntary are constitutional issues.  These

issues are resolved by the Court applying the facts to established case law interpreting the United States Constitution.  Congress may not legislatively supersede Supreme Court decisions or the decisions of other courts making such constitutional interpretations. Dickerson v. United States, 530 U.S. 428 (2000).  The tests to be applied in such a constitutional analysis are governed by legal precedent established by the Supreme Court and lower courts as addressed herein.  This is the standard this Court is obligated to follow in making that analysis.

75.     Based upon the totality of the evidence, this Court finds that each of the interviews were non-custodial in nature.  There was no restraint, arrest or detention which a reasonable person would feel restricted their freedom to such an extent that they were not free to leave.  Since these were non-custodial interviews, the Defendant was not entitled to Miranda warnings.  This Court finds no case law which required the agents to advise the Defendant that she did not have to speak with them, could call an attorney before either interview, call an attorney during either interview or cease either interview.

76.     The next issue this Court must decide is whether or not the statements made by the Defendant during these interviews were voluntary in nature.  This Court has taken into consideration the credibility of each witness based upon this Court's observation of the witnesses during their testimony and their ability to recollect specific facts. This Court finds Agent Kadela's recollection of the facts to be more reasonable as previously discussed herein. This Court finds that there is no evidence of any overreaching, threats or coercion by either agent during the interviews. It is uncontradicted that the Defendant contacted Agent Kadela to set up the continuation of the first interview as is memorialized in Government's Exhibit No. 1. If the Defendant had felt threatened after the first interview, then it would not seem logical for her to call Agent Kadela the very next day to apologize and schedule a continuation of that interview.

77.     This Court notes that Mr. Hilson testified that he and the Defendant believed they had no choice but to do what the FBI agents directed them to do and to answer their questions. However, there is no evidence that either the Defendant or Mr. Hilson at any time requested that either interview cease and the agents leave the residence. This Court points out that when the agents first arrived at the Defendant's residence on April 7, 2010 and requested to speak with her, the Defendant requested that her husband be present in the home. The agents complied with that request and asked when her husband would be back. They left the residence and returned at or about the time that Mr. Hilson arrived.

78.     This Court points out again that the second interview was set up by the Defendant after she left a message for Agent Kadela the very day after the first interview was terminated in consideration of the Defendant's emotional condition. The subjective beliefs of Mr. Hilson and the Defendant as to what they felt compelled to do are not the test. It is whether the objective facts establish that the agents imposed their will upon the Defendant and Mr. Hilson to such an extent that the Defendant's statements should be deemed to be involuntary. Based upon that standard, the Court finds there is no such evidence. The statements made by the Defendant during each interview are found to have been made freely and voluntarily.

**ACCORDINGLY**, this Court recommends to the District Court that the Defendant's Motion To Suppress Statements [D.E. #123] be **DENIED.**

The parties shall have fourteen (14) days from the date of this Report and Recommendation within which to file objections, if any, with the Honorable Jose E. Martinez, the United States District Judge assigned to this case.

**DONE AND SUBMITTED** this ⎯⎯day of April, 2012, at Fort Pierce, Northern

Division of the Southern District of Florida.

FRANK J. LYNCH, JR.
UNITED STATES MAGISTRATE JUDGE

Copies furnished:
Hon. Jose E. Martinez
AUSA Carmen M. Lineberger
Deric Zacca, Esq.

27